2025 IL App (1st) 231294

FIRST DISTRICT
SECOND DIVISION
September 16, 2025

No. 1-23-1294

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 14946 |
| | ) | |
| SAM HEWITT, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1     Petitioner Sam Hewitt was sentenced to natural life, plus 30 years, for two first-degree murders and an attempted third murder that he committed when he was 19 years old. More than a quarter of a century later, he alleged in a postconviction petition that his sentence violates the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Petitioner bases his claim on his status as an "emerging adult" who suffered from "severe mental illness" at the time of his crimes. We hold that petitioner forfeited his claim by failing to raise it at his sentencing. And in any event, a life sentence for a legal adult and the principal shooter in a premeditated double murder is not arguably unconstitutional.

¶ 2                          BACKGROUND

¶ 3                             I

¶ 4     Petitioner's convictions arise from a shooting on May 3, 1994. Petitioner was 19 years

old and a member of the Mafia Insane Vice Lords gang. His brother had recently been shot and paralyzed by the Gangster Disciples. Or at least petitioner blamed this rival gang. He vowed to avenge his brother's shooting, and indeed, by his own admission, he set out to kill as many Gangster Disciples as he could.

¶ 5    To this end, petitioner dressed in Gangster Disciple colors and went to a basketball court where they were known to play. Petitioner asked to join in. Not realizing that they were being false flagged, the four Gangster Disciples on the court agreed, but they asked petitioner to wait for the start of the next game in a few minutes. While he waited, or rather purported to wait, on a court full of easy, unsuspecting targets, petitioner opened fire, attempting (again, by his own admission) to kill everyone. George Goings and Naphtali Nunn were killed, and Quaran McKay was injured. Jeremiah Washington escaped unscathed.

¶ 6    Multiple eyewitnesses, including Washington, identified petitioner as the lone shooter. Petitioner confessed to the shooting after he was arrested. A jury convicted him of the murders of Goings and Nunn and the attempted murder McKay and acquitted him of the attempted murder of Washington.

¶ 7                                    II

¶ 8    A sentencing jury found petitioner eligible for the death penalty. The ensuing penalty-phase hearing featured extensive evidence that bears on the proportionate-penalties claim that petitioner would go on to raise, many years later, in his postconviction petition.

¶ 9    Assistant State's Attorney (ASA) Catherine Hufford, who took petitioner's handwritten statement, reiterated what petitioner himself had said: he learned of his brother's shooting while

he was imprisoned for a drug conviction and vowed to kill Gangster Disciples in revenge when released. Petitioner was paroled from his drug conviction on April 15, 1994, and carried out his plan less than three weeks later.

¶ 10    Far from expressing remorse, petitioner "was almost bragging" about the shooting to Detective Craig Cegielski when he was arrested. In Cook County Jail, petitioner told his fellow gang member Anthony Walker that he shot some Gangster Disciples on a basketball court, in retaliation for shooting his brother. Petitioner also told Walker about another incident, in which he and a friend shot and killed two Gangster Disciples. Detective James Griffin investigated a shooting at the location petitioner mentioned and found, as petitioner told Walker, that one of the victims was shot in the face and that a .380-automatic handgun was (one of the weapons) used.

¶ 11    At the age of 19, petitioner already had a significant criminal history. As a juvenile, he was adjudicated delinquent for theft, residential burglary, and attempted residential burglary. As an adult, he was convicted of delivery of a controlled substance and unlawful use of a weapon by a felon. He violated the probation he received for the latter offense. The State also introduced evidence of other uncharged conduct, including breaking into a car, breaking into an apartment to steal guns, and gang-related disorderly conduct.

¶ 12    And petitioner had an extensive history of disciplinary infractions while in custody. Betty McQueen, the supervisor of the Illinois Department of Correction (IDOC) Youth Center Records Unit, testified that petitioner arrived on September 22, 1989, to serve an eight-month sentence, but his disciplinary infractions delayed his parole until July 23, 1992. McQueen testified to 16 disciplinary reports, out of a total of 100, filed against petitioner in those two and a half years.

- 3 -

Among other things, petitioner threatened to kill a security officer.

¶ 13     In his few months at IDOC's Dixon Correctional Center, between July 1993 and April 1994, petitioner accumulated more than 20 disciplinary infractions. Among them: threatening officers, jamming the locks of his cell, damaging his cell door and other property, and ignoring orders. The keeper of the records testified that, to his knowledge, petitioner was not on any medication at the time.

¶ 14     Petitioner accumulated numerous, and often serious, disciplinary infractions in Cook County Jail, where he was in custody for this offense between 1994 and 1996. Among other persistent problems, he would set fire to his cell, rip out its light fixtures, jam its locks, and flood his toilet. He injured, insulted, and threatened officers, trying to stab one of them with a shank through the food tray chuckhole.

¶ 15     Petitioner's paternal grandmother, Ester Higgins, raised petitioner from the time he was four years old, when his mother abandoned him. Petitioner's mother was later shot to death, and so was his maternal grandmother. That said, Higgins testified that she raised petitioner as one of her own, alongside her two sons, who were like brothers to him. And while petitioner's father was not a full-time presence, he was a part of petitioner's life and did help to raise him. When petitioner would do something wrong, Higgins said, his father would come by and sit him down for a talk. Higgins insisted, however, that petitioner was "not a bad child," although he was constantly truant from school. Higgins never followed up on the school's recommendation to have petitioner evaluated by a psychiatrist.

¶ 16     The defense recalled McQueen to testify about the clinical psychiatric and psychological

evaluations petitioner received in juvenile custody, during the summer of 1990, when he was 15 years old. Around that time, petitioner was placed under close supervision for threatening to kill himself. His psychiatric evaluation gave him a prognosis of "guarded to poor" and recommended therapy and medication. Petitioner was prescribed imipramine (an antidepressant) and Thorazine (an antipsychotic), but he resisted taking them. He acted impulsively, with little thought of the consequences; displayed poor judgment; and was prone to agitating others. The psychological evaluation added that petitioner appeared intellectually limited and preoccupied with death, often displayed confused or paranoid behavior, and had "difficulty staying in touch with reality." Petitioner was diagnosed with a conduct disorder, ADHD, and organic personality syndrome.

¶ 17    Petitioner's key witness was Dr. Lawrence Heinrich, a forensic and clinical psychologist. The ultimate point of Dr. Heinrich's testimony was to establish that petitioner was under the influence of an extreme mental or emotional disturbance when he committed the offenses—a mitigating factor that would preclude the death penalty. Dr. Heinrich opined that this mitigating factor was present. His reasons for this conclusion are also relevant to a proportionate-penalties claim based, in part, on petitioner's alleged mental illness.

¶ 18    First, Dr. Heinrich made three diagnoses based on the DSM-IV criteria. The first was an Axis I diagnosis, meaning a mental illness that causes periodic, often short-term, disturbances in one's thinking process, such as a brief psychotic episode. Specifically, Dr. Heinrich diagnosed petitioner with schizoaffective disorder, characterized by significant disturbances of thought and mood that interfered with petitioner's daily functioning and adaptive style and resulted in exaggerated mood swings.

¶ 19    On Axis II, Dr. Heinrich diagnosed petitioner with borderline intellectual ability, as his IQ was between 70 and 80 and his math and reading skills were at the fifth- and third-grade levels, respectively. He also diagnosed petitioner with a severe personality disorder, with features of a borderline personality disorder and anti-social personality disorder. These Axis II diagnoses reflect long-term, indeed permanent, personality disorders and cognitive limitations. Someone with an Axis II personality disorder may function, but will have maladaptive ways of coping with stress that interfere with personal relationships.

¶ 20    Second, Dr. Heinrich reached two related conclusions based on his review of petitioner's evaluations and disciplinary reports in IDOC. On the one hand, petitioner's chronic disciplinary problems in custody illustrated "his impulsiveness, his explosiveness, his inability at times to control his behavior." On the other hand, Dr. Heinrich found that petitioner's behavior seemed to improve when he was on psychotropic medications, a "diagnostically significant" finding. He further noted that there was no indication that petitioner ever received medication or other treatment outside of a custodial setting, which in his opinion "certainly would contribute to problems that he is going to act out seriously and have adjustment difficulties."

¶ 21    Third, Dr. Heinrich explained that petitioner's exposure to violence may have impacted his tolerance for violence and the likelihood that he would engage in it himself. In this context, Dr. Heinrich noted that petitioner's mother, maternal grandmother, and uncle were all murdered, not to mention his brother's shooting, which supplied the motive for these offenses.

¶ 22    Fourth, and less favorably for petitioner, Dr. Heinrich found evidence that petitioner malingered, exaggerated his symptoms, and lied during the interview. Being manipulative, he

noted, is a trait of borderline personality disorder. But Dr. Heinrich did not think that petitioner was completely "faking it," as he had received too many adverse consequences as a result of the behaviors in question.

¶ 23    In rebuttal, the State called Dr. Paul Fauteck, the psychologist from Forensic Clinical Services who evaluated petitioner's fitness (and found him fit) before trial. Dr. Fauteck disagreed with Dr. Heinrich in a number of respects. For one, he found no evidence of any mental disorder or illness that would warrant an Axis I diagnosis. He also disagreed with Dr. Fauteck's Axis II diagnosis of schizoaffective disorder, and he did not think that petitioner suffered from any major mood or affective disorder at all.

¶ 24    Dr. Fauteck did agree with the diagnosis of antisocial personality disorder. But as he explained, this is not a true mental illness or disturbance; rather, it is a long-term pattern of maladjustment that is common among criminals, being found in an estimated 60 to 80% of incarcerated males. It cannot be treated with medication, though heavily sedating medications, such as Thorazine, are sometimes used in lieu of shackles to control violent behavior. All in all, Dr. Fauteck disagreed with Dr. Heinrich's conclusion that a mitigating factor was present, as he did not believe that petitioner suffered from an extreme mental or emotional disturbance when he committed these offenses.

¶ 25    The jury was instructed on that particular mitigating factor. It was further instructed that a mitigating factor could be "any other reason supported by the evidence why [petitioner] should not be sentenced to death," whether or not it was specifically included in the instructions. The jury did not unanimously find "that there are no mitigating factors sufficient to preclude a death

sentence." In other words, the jury rejected the death penalty—for unspecified reasons, given the general nature of the sentencing verdict.

¶ 26    Pursuant to the multiple-murder statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1992)), the trial court thus sentenced petitioner to mandatory natural life for the double murder, plus a consecutive 30-year term for attempted murder.

¶ 27    At the sentencing hearing with the judge, defense counsel said, "[S]ince this was classified as a multiple murder *** we would be challenging the statute's constitutionality without argument. I think the Supreme Court has already decided that." Counsel did not specify a basis for this purported constitutional challenge to the multiple-murder statute, and at no point was a proportionate-penalties challenge explicitly raised in the trial court. Counsel did not file a motion to reconsider sentence. Petitioner's sentence was not challenged on direct appeal. *People v. Hewitt*, No. 1-96-3528 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 28                                  III

¶ 29    On January 4, 2023, nearly 25 years after his direct appeal was decided, petitioner filed what appears to be a pre-printed form document captioned, "Motion for leave to file successive post-conviction petition." But as the State concedes, this was, in fact, petitioner's initial postconviction petition. Petitioner raised a single issue: an as-applied challenge to his mandatory life sentence under the proportionate penalties clause.

¶ 30    The crux of his claim is that, in sentencing him to mandatory natural life, the trial court was precluded from considering his "youthful age of 19," the "transient qualities" that age entailed, his "emotional shock during childhood," and his "rehabilitative potential." Petitioner

further alleged that *Miller v. Alabama*, 567 U.S. 460 (2012), established cause for his failure to raise this claim earlier. As support for his claim, petitioner attached various scholarly papers, newspaper articles, and other publications addressing the general scientific and policy issues raised by his claim.

¶ 31    Petitioner also attached his own affidavit, in which he attested to the circumstances and challenges of his upbringing. Born prematurely to a young, drug-addicted mother, who was in and out of prison, and an unemployed father, petitioner was all but abandoned by his parents from the very start. After being severely beaten—by whom, he did not say—he was sent to live with his grandmother at the age of four. "[T]hat should have helped," he admitted, but he was "damaged" and felt "alone," living without his parents or siblings. These feelings led him to "act out" at home and at school, and those disciplinary problems soon escalated to criminal conduct, leading to periods of incarceration.

¶ 32    While in custody, he has "been on a few different meds." In 1993, he was shot by Chicago police. As he concluded,

> "I've been trying to change and break the cycle. I got no love, no guidance, no education, nothing from my parents. I found it all while in jail. I found it within myself. I've grown up a lot [and] I understand my errors. And I know that I am a better person now than the person I was 28 years ago."

¶ 33    The circuit court treated the filing as a successive petition and denied leave to file. Citing *People v. Dorsey*, 2021 IL 123010, the circuit court rejected the argument that *Miller* provided cause. The circuit court also found that petitioner did not establish prejudice, in part because he

failed to connect the science on emerging adults to his own particular circumstances and in part because he failed to show that his youth and its attendant qualities were not considered at his original sentencing hearing. Lastly, on the merits of petitioner's claim, the circuit court stressed that he was the principal shooter in a premeditated double murder.

¶ 34                                    ANALYSIS

¶ 35    Petitioner contends that his mandatory life sentence arguably violates the proportionate penalties clause because it "does not account for his status as an emerging adult with severe mental illness." As noted, he draws inspiration from *Miller*, 567 U.S. 460.

¶ 36    One preliminary point. The State does not dispute that petitioner's filing is, in fact, an initial postconviction petition. The circuit court, unaware that petitioner mislabeled his belated petition, improperly applied the cause-and-prejudice test. The remedy on appeal is to apply the legal standard for a summary dismissal of an initial petition, without remanding to the circuit court for a first-stage ruling. *People v. Wilson*, 2014 IL App (1st) 113570, ¶ 41.

¶ 37    We thus conduct our own *de novo* review of the petition and ask whether it alleges an arguable constitutional claim. *People v. Williams*, 2024 IL 127304, ¶¶ 15-17. Forfeiture is a proper basis for dismissal at the first stage. *People v. Johnson*, 2021 IL 125738, ¶ 48; *People v. Blair*, 215 Ill. 2d 427, 442-45 (2005) (forfeited claims are, by definition, frivolous or patently without merit under postconviction statute and warrant summary dismissal). We may affirm a summary dismissal on any basis in the record. *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 37.

¶ 38                                        I

¶ 39    The State says petitioner forfeited his proportionate-penalties challenge because he did

not raise it on direct appeal. That is undoubtedly true. But while the State did not argue as much, it is equally true that petitioner forfeited this challenge by failing to raise it *at trial*. The "essential legal tools," not to mention a detailed factual record, were in hand at sentencing. *People v. Moore*, 2023 IL 126461, ¶ 42. He needed to raise his as-applied challenge then. Simply put, petitioner forfeited this claim twice over—at trial by failing to raise it, and on direct appeal, when he could have raised it by way of plain error or ineffective assistance of trial counsel.

¶ 40    This should not be a controversial position. The forfeiture doctrine has existed for ages. But petitioner argues that forfeiture is forgiven in the context of claims like the one here— namely, a proportionate-penalties claim with *Miller*-inspired arguments—and thus it may be raised as a freestanding claim for the first time in a postconviction petition. It is true that some decisions from this court have given that impression. But that impression is mistaken; there is nothing magical about a proportionate-penalties claim, even if inspired by *Miller*, that forgives forfeiture. And believing so leads to bad results for defendants and the justice system as a whole.

¶ 41                                          A

¶ 42    Start with the most basic of propositions: a defendant forfeits a claim, even a constitutional claim, if he fails to raise it at trial. *People v. Thompson*, 2015 IL 118151, ¶ 39; *People v. Hillier*, 237 Ill. 2d 539, 547 (2010) (defendant's fifth amendment challenge to his sex-offender evaluation was not raised at trial and was thus forfeited); *People v. Ivanchuk*, 2025 IL App (4th) 241230, ¶ 42 (defendant forfeited fourth-amendment challenge to vehicle stop by failing to raise it at trial).

¶ 43    There are a few exceptions to forfeiture. The most common are judgments that are void,

either for lack of subject-matter or personal jurisdiction or because they are based on a *facially invalid* statute. These judgments may be challenged at any time. See *Thompson*, 2015 IL 118151, ¶¶ 31-32. The as-applied challenge petitioner raises here falls under none of those exceptions.

¶ 44    Notably here, there is a "very narrow exception" to forfeiture "for an as-applied *Miller* claim for which the record is sufficiently developed for appellate review." *People v. Holman*, 2017 IL 120655, ¶ 32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42; see *People v. Harris*, 2018 IL 121932, ¶ 44.

¶ 45    But a *Miller* claim is not just any claim that mentions that Supreme Court decision. *Miller* applies in only one specific context—namely, to (1) a juvenile who challenges, (2) under the eighth amendment, (3) a mandatory sentence (4) of *de facto* life, meaning a sentence that requires him to serve over 40 years in prison before any chance of parole.

¶ 46    Change any of those criteria—the defendant was 18 or older at the time of the offense; the claim is not under the eighth amendment; the sentence was not mandatory; the defendant has the chance for parole within 40 years—and it is not a *Miller* claim. See, *e.g.*, *Harris*, 2018 IL 121932, ¶¶ 44-45 (defendant who was 18 at time of offense could not assert *Miller* claim); *Dorsey*, 2021 IL 123010, ¶ 74 (*Miller* limited to claims under eighth amendment, not proportionate-penalties clause); *Dorsey*, 2021 IL 123010, ¶¶ 50, 62 (76-year sentence was not *de facto* life, and *Miller* thus did not apply, as day-for-day credit made defendant eligible for parole within 38 years); *Wilson*, 2023 IL 127666, ¶¶ 39-42 (*Miller* does not apply to discretionary sentences of any length).

¶ 47    Understood as such, this exception for true *Miller* claims makes sense in that many of the

reasons for invoking forfeiture fall by the wayside in that narrow context. One of the principal purposes of forfeiture is to incentivize the creation of a factual record at trial sufficient for appellate review. But a true *Miller* claim does not require that record.

¶ 48    Appellate review of a true *Miller* claim consists merely of determining the defendant's age at the time of the offense, whether the sentence was mandatory or discretionary, the length of the sentence, and—most notably here—whether the sentencing court appropriately considered the defendant's youth and attendant characteristics. Whether there is an "adequate" or inadequate" record on appeal is literally *part of the analysis*. If the record is undeveloped, you have your answer: the court did not adequately consider the relevant youth-based factors, so a remand is necessary to consider them. *People v. Davis*, 2014 IL 115595, ¶ 43; see *Harris*, 2018 IL 121932, ¶ 43 (explaining *Holman*'s exception for true *Miller* claims: "All of the facts and circumstances necessary to decide the defendant's *Miller* claim were already in the record.").

¶ 49    A proportionate-penalties claim is not, and never has been, a *Miller* claim, if for no other reason because it is not based on the eighth amendment. See *Moore*, 2023 IL 126461, ¶ 42; *People v. Robert Clark*, 2023 IL 127273, ¶ 61; *Dorsey*, 2021 IL 123010, ¶ 74. A sentence violates the proportionate-penalties clause in one of two ways: it violates the identical-elements test (not relevant here) or the sentence "shock[s] the moral sense of the community" in some way. *People v. Sharpe*, 216 Ill. 2d 481, 503-04, 517 (2005). A sentence may shock the community's moral sense because the defendant's relatively minor culpability does not match the draconian sentence he received. See *People v. Leon Miller*, 202 Ill. 2d 328 (2002). A court might consider the defendant's youth and immaturity along with his minor participation in the

crime in finding a resulting sentence shocking to the moral sense. See *People v. House*, 2021 IL 125124, ¶ 9.

¶ 50    Or a young adult defendant might argue, akin to a *Miller* eighth-amendment claim, that the sentencing court failed to appropriately consider the defendant's youth and its attendant characteristics. A true *Miller* claim it is not (*Dorsey*, 2021 IL 123010, ¶ 74), but there is no reason why this argument could not, in theory, establish that the sentence shocks the conscience in the appropriate case. See *Robert Clark*, 2023 IL 127273, ¶ 87). The *Miller* decision, in that instance, might provide " 'helpful support.' " *Dorsey*, 2021 IL 123010, ¶ 74 (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 51    These arguments could even be combined—the defendant's youth *and* his lack of meaningful participation in the offense. And there might be other arguments. But they are just that—arguments. The *claim* remains the same: a proportionate-penalties claim. It does not fall within the "very narrow exception" to forfeiture for true *Miller* claims. So it can be forfeited, just like any other claim, constitutional or otherwise. *Thompson*, 2015 IL 118151, ¶ 39.

¶ 52                                        B

¶ 53    The cases cited by petitioner, suggesting that an undeveloped proportionate-penalties claim based on *Miller* is exempt from forfeiture and may be raised for the first time on postconviction review, stem initially from our supreme court's decision in *Harris*, 2018 IL 121932. We do not think the supreme court exempted the defendant's claim there from forfeiture, but we understand why some might have so read that decision.

¶ 54    The defendant there, Harris, did not argue at trial that his sentence violated the

proportionate-penalties clause. *Id.* ¶ 40. But when raised on appeal for the first time, the appellate court found that it did and vacated his 76-year sentence. *Id.* ¶ 1. In the supreme court, the State argued that Harris forfeited his claim by failing to raise it at trial. *Id.* ¶ 35. Harris tried to fit within the narrow *Holman* exception to forfeiture for as-applied *Miller* challenges. *Id.* ¶ 42.

¶ 55 The supreme court held that *Holman*'s narrow exception to forfeiture did not apply for two reasons. For one, Harris was 18 at the time of the offense, so *Miller* simply did not apply in any event. *Id.* ¶ 45. And second, true *Miller* claims do not require a developed factual record (as we have discussed above). *Id.* ¶ 44. In contrast, a proportionate-penalties claim does, yet the record there showed "only basic information about [Harris], primarily from the presentence investigation report." An "evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to [Harris] as an adult." *Id.* ¶ 46. "Accordingly," wrote the court, "defendant's as-applied challenge is premature." *Id.*

¶ 56 The supreme court reversed the appellate court's vacatur of the sentence, thus reimposing the sentence. *Id.* ¶ 63. The court declined to remand the matter to the circuit court to develop a factual record for the as-applied proportionate-penalties claim, finding it "more appropriately raised" in a collateral proceeding like a postconviction petition. *Id.* ¶ 48.

¶ 57 On the one hand, that sounds like a holding that Harris's proportionate-penalties claim was forfeited. After all, the State so argued, Harris tried to fit within the exception to forfeiture for true *Miller* claims, and the supreme court held that his claim did not fit within that exception. If the claim does not fit within the exception to forfeiture, does it not follow that it's forfeited? But the supreme court never said so explicitly, and if the claim were forfeited, there would have

been nothing left to say.

¶ 58　Instead, the court deemed the claim "premature" (*id.* ¶ 46) and then considered whether to remand the matter to the circuit court for an evidentiary hearing. True, the court declined to do so, finding it "more appropriate[ ]" for a postconviction petition (*id.* ¶ 48)—but if the claim had been forfeited, the option of a remand to develop the record would have been out of the question. An attempt at collateral review would not have been "more appropriate[ ]"—it would have been the *only* remaining recourse for Harris.

¶ 59　In any event, as petitioner notes on appeal, some appellate decisions have seized on the "premature" language in *Harris* and, rather than finding forfeiture, have merely noted that the record below is undeveloped, thus leaving postconviction relief as the more appropriate recourse.

¶ 60　For example, in *People v. Marquad Harris*, 2020 IL App (5th) 160454, ¶ 1, the defendant was convicted of first-degree murder and sentenced to 51 years. He did not raise a constitutional challenge at sentencing or in a post-sentencing motion. *Id.* ¶ 72. On appeal, he raised a proportionate-penalties challenge based on *Miller*. *Id.* ¶ 67.

¶ 61　This court, relying on the supreme court's *Harris* decision, found "no evidentiary record to support defendant's constitutional claim" and thus "decline[d] to consider defendant's as-applied constitutional challenge to his sentence." *Id.* ¶ 72. But " '[c]onsistent with' " our supreme court's *Harris* decision, the court added that " 'we do not intend for our disposition to preclude defendant from advancing his claim through other available proceedings.' " *Id.* (quoting *People v. Figueroa*, 2020 IL App (2d) 160650, ¶ 89).

¶ 62　One would think that the correct outcome to that case would have been to acknowledge

that the matter was forfeited for failure to raise the proportionate-penalties claim at trial. And because it was not raised on appeal under the guise of plain error or ineffective assistance of trial counsel, there would be no basis to consider the argument—not because of an undeveloped trial record, but because it was *forfeited*. True, a recourse to postconviction proceedings would still be appropriate, but *not* to assert a freestanding proportionate-penalties claim—rather, to assert an *ineffectiveness* claim against both trial and appellate counsel for *failing* to raise the proportionate-penalties claim at trial or on direct appeal. See *Williams*, 2024 IL 127304, ¶ 20 (noting that postconviction petitioner "can avoid the procedural bar of forfeiture by casting his claims as ineffective assistance of [trial and/or] appellate counsel").

¶ 63    Regardless, another court followed *Marquad Harris* and reached the same result. In *People v. Ford*, 2021 IL App (5th) 170259, ¶¶ 1, 27, 29, cited here by petitioner, the defendant received a 55-year sentence for murder but did not raise a constitutional challenge to his sentence at any time, even in a post-sentencing motion. Without mentioning forfeiture, the appellate court, following the lead of the supreme court *Harris* decision, noted that "the record does not contain evidence or findings from the trial court as to how the evolving science on juvenile maturity and brain development applied to the defendant's specific facts and circumstances." Thus, the appellate court did not "consider the defendant's as-applied challenge because it is premature." *Id.* ¶ 29. The court added that it did not intend " ' "to preclude defendant from advancing his claim through other available proceedings." ' " *Id.* (quoting *Marquad Harris*, 2020 IL App (5th) 160454, ¶ 72, quoting *Figueroa*, 2020 IL App (2d) 160650, ¶ 89).

¶ 64    Other cases cited by petitioner reached like conclusions. See *People v. Berry*, 2023 IL

App (4th) 210675-U, ¶ 119 (based on supreme court's *Harris* decision, declining to consider defendant's *Miller*-inspired proportionate-penalties argument raised for first time on appeal not because it was forfeited but because "no evidentiary hearing has been held on this claim, and a trial court has not made any findings of fact with regard to defendant's specific circumstances").

¶ 65    Another case cited by petitioner deserves special mention. In *People v. Herring*, 2022 IL App (1st) 210355, ¶¶ 8-9, 37, the petitioner, age 19 at the time of the offenses, was sentenced to mandatory natural life for a double murder. He raised an as-applied proportionate-penalties challenge inspired by *Miller*, for the first time, in his initial postconviction petition. *Id.* ¶ 36. The State argued that he forfeited his claim by failing to raise it at sentencing. *Id.* The appellate court held that the claim was not forfeited, since it would have been "futile" to challenge a "mandatory" penalty at his sentencing hearing. *Id.* ¶ 37.

¶ 66    We respectfully but firmly disagree with the majority opinion in *Herring*. The fact that a sentence is mandatory under a *statute* does not make a *constitutional* challenge futile; it means that a constitutional challenge is the defendant's only option. Herring could not have asked the trial court to impose a term-of-years sentence as a matter of discretion, but he surely could have asked the court to find the mandatory sentence unconstitutional under the proportionate-penalties clause. Look no further than *Leon Miller*, 202 Ill. 2d at 331-32, 343, where the defendant did just that, successfully, at sentencing, and the supreme court affirmed.

¶ 67    We understand that our supreme court, in *Harris*, focused largely on the absence of a developed record, possibly leading these courts to believe that the problem was not forfeiture but merely an incomplete trial record. But we must respectfully and reluctantly conclude that each of

these decisions—*Marquad Harris*, 2020 IL App (5th) 160454; *Ford*, 2021 IL App (5th) 170259; *Berry*, 2023 IL App (4th) 210675-U; and *Herring*, 2022 IL App (1st) 210355—should have directly tackled the issue of forfeiture and erred in failing to do so.

¶ 68     These decisions would leave a defendant with the impression that he can fail to raise a proportionate-penalties challenge to his sentence at trial, raise it for the first time on appeal as a freestanding claim (not by way of plain error or ineffective assistance), and if the record is developed, the appellate court will hear it; if not, he can go to postconviction proceedings and raise the freestanding claim there. Or even better, as in *Herring*, he could avoid all mention of it at trial or on direct appeal and raise the proportionate-penalties claim as a freestanding claim, for the first time, in a postconviction petition.

¶ 69     That cannot be, and is not, the law. First, as discussed, these decisions may have overread the supreme court decision in *Harris*, which could be fairly interpreted as a forfeiture decision itself. But second and more importantly, starting with a line of decisions beginning in 2021, our supreme court has made it clear that forfeiture principles apply to proportionate-penalties claims, even if inspired by *Miller*. These decisions arose in the context of successive postconviction petitions, where a petitioner must satisfy the familiar cause-and-prejudice standard.

¶ 70     The first was *Dorsey*, 2021 IL 123010, ¶ 74, where the supreme court held that *Miller* did not supply "cause" to excuse the failure to raise a *Miller*-inspired proportionate-penalties claim earlier. The court reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing," and thus "*Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state

constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (quoting *LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 71    In rapidly evolving jurisprudence following the 2012 *Miller* decision, with defendants of various ages (under 18 or 18 to 21) attempting to cite *Miller* for various constitutional claims (eighth amendment or proportionate-penalties) in any number of contexts (direct appeal, initial postconviction petition, successive postconviction petition, section 2-1401 petitions), *Dorsey* at least cleared some of the weeds: *Miller* did not create a new claim under the proportionate-penalties clause. That claim always existed; a defendant, whether a juvenile or young adult, has always been able to raise a proportionate-penalties claim based on the sentencing court's failure to appropriately consider the defendant's youth and its attendant characteristics.

¶ 72    That ruling was nothing more than a forfeiture ruling. The "cause" element of the cause-and-prejudice test is a rule of forfeiture—a reason to excuse a "failure to bring the claim" that would otherwise result in forfeiture. 725 ILCS 5/122-1(f), 122-3 (West 2022); *People v. Lusby*, 2020 IL 124046, ¶ 27 ("cause" requirement in statute is rule of forfeiture).

¶ 73    Other decisions reiterated that *Miller* did not create a new proportionate-penalties claim immune from forfeiture. See *Robert Clark*, 2023 IL 127273, ¶ 61 ("long before *Miller*, Illinois law recognized the special status of juvenile offenders for purposes of applying the principles under the proportionate penalties clause"); *Moore*, 2023 IL 126461, ¶ 42 ("As *Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced in [defendants'] proposed successive postconviction petitions.").

¶ 74    True, *Dorsey* and its progeny concern successive postconviction petitions, not direct

appeals or initial petitions. But there is no reason to limit those holdings to that context. The principle of forfeiture begins at the trial stage and continues throughout. Once *Dorsey* clarified that *Miller* did not create a new proportionate-penalties claim, there was no longer any reason to believe that proportionate-penalties claims inspired by *Miller* should be treated differently than any other constitutional claim—they may be forfeited.

¶ 75                                                    C

¶ 76    The application of forfeiture may seem harsh, but it creates the right incentives, not only for judicial economy but to induce the parties to seek their remedies in the best possible tribunal. " '[R]ules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time.' " *Massaro v. United States*, 538 U.S. 500, 504 (2003) (quoting *Guinan v. United States*, 6 F.3d 468, 474 (7th Cir. 1993) (Easterbrook, J., concurring)).

¶ 77    For an as-applied challenge that requires "factual development," "the trial court is the most appropriate tribunal" in which to raise it. *Thompson*, 2015 IL 118151, ¶ 38; see *Holman*, 2017 IL 120655, ¶ 32 ("*Thompson* instructs that a defendant must present an as-applied constitutional challenge to the trial court"). That is true, of course, of *any* sentencing argument, constitutional or otherwise, which is why it is "well settled" that to avoid forfeiture, sentencing challenges in general must be raised at sentencing. *People v. Clark*, 2024 IL 127838, ¶ 69; *People v. Fort*, 2017 IL 118966, ¶ 18.

¶ 78    There are at least two key reasons why a sentencing hearing is the ideal forum—and a decidedly better forum than a postconviction petition—for raising an as-applied challenge. First, the defendant already has a lawyer at sentencing who can argue his claim (free of forfeiture) and

develop a factual record to support it. In a postconviction petition, he must go it alone at the first stage and earn back the lawyer he once had by showing that his claim has arguable merit.

¶ 79    To a prisoner with no lawyer, limited resources, and often little schooling, that is no small task, even at the first stage of an initial postconviction petition, where he need only establish the "gist" of a constitutional claim. The petitioner must plead his claim, avoid default, and "alleg[e] facts about himself" that are salient to a developmental assessment and, in turn, allege a legal determination about his culpability in light of his age and maturity. *Williams*, 2024 IL 127304, ¶¶ 34-35. Said differently, "[a]n emerging adult postconviction petitioner who simply cites his age at the time of the offense and the evolving science on juvenile maturity and brain development does not state the gist of an as-applied claim that a mandatory life sentence violates the proportionate penalties clause of the Illinois Constitution." *Id.* ¶ 31. Will an unschooled prisoner understand that? If he doesn't, his claim will die before he ever gets a lawyer.

¶ 80    Second, if the *pro se* petitioner manages to clear these hurdles and receives appointed counsel, the record that his lawyer will be able to build is almost guaranteed to be inferior to the record that could have been built at sentencing. This is especially true for a young adult, whose claim, in a nutshell, is that he may be an adult, but he is functionally still a child, and his crime, in no small measure, is the product of this transient immaturity.

¶ 81    This argument is best made, and evaluated, while the young adult is still before the court with the experts who can evaluate him—in other words, at sentencing. In a collateral proceeding, the assessment must be made retrospectively, years—often many years—later. In the intervening years, the young adult will have matured to whatever degree. The retrospective determination

will thus be fraught and uncertain at best.

¶ 82    That does not serve the defendant's interest in relief or the judiciary's interest in reliable decision-making. In short, there is no good reason to postpone an as-applied challenge until collateral review. A postconviction petition is generally a defendant's last remaining hope for raising a forfeited challenge, not an ideal forum for raising it in the first instance.

¶ 83    A sensible forfeiture rule will incentivize claimants to avail themselves of the ideal forum. *Massaro*, 538 U.S. at 504. The law must be clear on the question of forfeiture so that trial attorneys will understand the critical importance of raising the claim at sentencing, that no special rules will apply for a proportionate-penalties claim that invokes the *Miller* decision.

¶ 84    Whether that proportionate-penalties claim is made immediately in response to a mandatory sentence that leaves the court with no discretion (see *Leon Miller*, 202 Ill. 2d 328) or in a post-sentencing motion after the court imposes a lengthy sentence, the message must be clear and consistent: the time to raise this challenge is at sentencing, where the record can best be made and the defendant's argument can be considered in its best light.

¶ 85                                    D

¶ 86    Here, petitioner did not raise his as-applied challenge at sentencing. (Counsel's bare assertion that "we would be challenging the [multiple-murder] statute's constitutionality without argument" does not suffice.) Notably, in *Moore*, 2023 IL 126461, ¶ 42, "[t]he evidence and arguments raised at the sentencing hearings *** show the parties knew Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause." The murders in *Moore* took place

in 1997 (*id.* ¶¶ 5, 20), so the case is of a similar vintage to this case, with murders in 1994. Petitioner's trial counsel should have been alert to the possibility of a constitutional challenge and should have raised it at sentencing. Counsel failed to do so, resulting in forfeiture.

¶ 87                                                      II

¶ 88    We acknowledge the confusion in the case law might have led petitioner to believe that, in his initial postconviction petition below, he could raise a freestanding, as-applied challenge to his sentence under the proportionate-penalties clause. To be clear, that is incorrect; his claim is forfeited. And thus the only way he could have preserved his claim in his initial postconviction petition is to allege ineffective assistance of trial and appellate counsel for failing to raise this claim at trial and on direct appeal. See *Williams*, 2024 IL 127304, ¶ 20 (postconviction petitioner who failed to raise proportionate-penalties claim at trial or on direct appeal "can avoid the procedural bar of forfeiture by casting his claims as ineffective assistance of [trial and/or] appellate counsel"). Here, petitioner obviously did not allege ineffectiveness.

¶ 89    But given the confusion in the case law, it is in the interests of justice to explain, briefly, why petitioner's proportionate-penalties claim would fail, even were it not forfeited. We are able to do so because, ironically enough, though counsel at sentencing never raised a constitutional challenge, counsel *did* develop an incredibly detailed factual record to avoid the death penalty.

¶ 90    Though he did not take the additional step of challenging his mandatory life sentence as a constitutional violation, he nevertheless developed a record that, we feel safe in concluding, would have been functionally identical to one created for a proportionate-penalties challenge. As we discussed earlier, there was extensive, albeit contested, evidence of petitioner's alleged

mental illnesses. Higgins spoke to the challenges and adverse influences petitioner faced growing up. Dr. Heinrich's discussion of his disciplinary records spoke explicitly to "his impulsiveness" in his mid-to-late teenage years. And Dr. Heinrich's analysis of the efficacy of treatment in prison, though not offered for quite this purpose, had implications for his rehabilitative prospects.

¶ 91    The proportionate-penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates this provision if it is " ' "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." ' " *Williams*, 2024 IL 127304, ¶ 24 (quoting *People v. Hilliard*, 2023 IL 128186, ¶ 20, quoting *Leon Miller*, 202 Ill. 2d at 338). The proportionate-penalties clause recognizes that the community's moral sense " ' "evolves" ' " over time, as a function of our evolving " ' "concepts of elemental decency and fairness." ' " *Id.* (quoting *Hilliard*, 2023 IL 128186, ¶ 20, quoting *Leon Miller*, 202 Ill. 2d at 339).

¶ 92    The parties both assume that a mandatory life sentence is essential to the kind of claim that petitioner raises here under the proportionate-penalties clause. The State is thus eager to insist that his life sentence was discretionary, on the ground that the jury could have imposed the death penalty instead.

¶ 93    That premise is simply wrong. Proportionate-penalties claims have never been limited to mandatory sentences; they apply equally to discretionary sentences. Nor are they limited to life sentences. Indeed, "[a] defendant may challenge a sentence of any length" under the

proportionate-penalties clause. *People v. Spencer*, 2025 IL 130015, ¶ 43 (young adult could raise as-applied challenge to term of years that was not *de facto* life sentence); *Hilliard*, 2023 IL 128186, ¶ 29. If the challenged sentence does not need to be a life sentence at all, it certainly does not need to be a mandatory life sentence.

¶ 94    Again, the premise of the parties' shared misunderstanding is that a proportionate-penalties claims transforms into some new claim when it is inspired by *Miller*. That is not the case. Such a claim might bootstrap the reasoning and the science from *Miller*, but it cannot bootstrap the law of *Miller*. Once more: "*Miller* did not change the law applicable to young adults." *Moore*, 2023 IL 126461, ¶ 42. Which means there is no special kind of proportionate-penalties claim, modeled on the law of *Miller*, that is uniquely available when a mandatory life sentence is imposed on a young adult. And to come full circle, that is why *Miller* does not provide cause to raise a proportionate-penalties claim in a successive, post-*Miller*, petition. *Id.*

¶ 95    Simply put, after *Miller*, a young adult's proportionate-penalties claim is the same as it has always been. The basis for the claim is not the trial court's lack of discretion under a sentencing statute. That is only the case for an actual *Miller* claim, raised by a juvenile, under the eighth amendment. Under the proportionate-penalties clause, the challenge, as always, is to the length of the sentence itself. And the claim, as always, is that the sentence is grossly disproportionate to the defendant's culpability under the circumstances of that particular case—so much so that, under prevailing standards of decency and fairness, the sentence must be deemed unconscionable.

¶ 96    Here, petitioner's sentence was not arguably unconscionable or unconstitutional. Briefly,

his claim falls on the wrong side of every significant line the law has drawn in this area. In *Leon Miller*, 202 Ill. 2d at 332, for example, the 15-year-old defendant was merely a "passive" lookout who never touched a gun and had less than a minute to comprehend the unfolding events. Petitioner, in contrast, was a legal adult and the principal, indeed the sole, shooter. See *Hilliard*, 2023 IL 128186, ¶ 34 (*Leon Miller* "readily distinguishable" from young adult who made "deliberate choice" to shoot victim and "acted alone.")

¶ 97     Nor was this "a botched robbery [that] turn[ed] into a killing," as in (both consolidated cases in) *Miller*, 567 U.S. at 473. An impetuous late-teenage boy, or someone who is mentally or cognitively impaired, might fail to foresee just how easily a robbery or other such crime can spiral into an unplanned killing. But the double murder and the attempted third murder in this case were anything but unplanned. They were premeditated.

¶ 98     Petitioner was incarcerated when he learned that his brother was shot by some Gangster Disciples, and he immediately vowed to kill as many rival gang members as possible in revenge. Petitioner thought up a plan, clearly calculated to inflict maximum damage, and coldly carried it out after weeks of premeditation. Shortly after his release, he went to a basketball court, dressed in Gangster Disciples colors, where members of the gang were known to play. The unsuspecting Gangster Disciples accepted him into their midst and continued their game. Having successfully false-flagged his targets, petitioner ambushed them while they were preoccupied and defenseless.

¶ 99     Unlike the case of an accomplice who gets roped into unfolding events, or a robbery gone bad, petitioner's forethought is evident in his crimes. His tactical plan to kill as many Gangster Disciples as possible, weeks if not more in the making, belies any claim that his crimes were the

product of impetuous youth or delusional mental illness. He knew what he was doing and why. Whatever else might be said about his mentality and development at the time, in this particular instance, it is clear that petitioner was in touch with reality and his own murderous intent. He may have been a *young* adult, and a troubled, maladjusted one at that, but there is all too much about his crimes that these facts fail to explain.

¶ 100   There is more to be said, in the small, about the shortcomings of petitioner's claim. But we will leave the matter at that. Petitioner's claim is forfeited, and in any event, a life sentence for a premeditated double murder committed by a legal adult is not arguably unconstitutional. Petitioner's as-applied proportionate-penalties claim is subject to summary dismissal.

¶ 101                                    CONCLUSION

¶ 102   The judgment of the circuit court is affirmed.

¶ 103   Affirmed.

*People v. Hewitt*, 2025 IL App (1st) 231294

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 94-CR-14946; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Margaret M. Smith, Assistant State's Attorneys, of counsel), for the People. |