2026 IL App (1st) 231149-U

No. 1-23-1149

Third Division
June 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 06 CR 21382 01 |
| v. | ) ) | |
| | ) | The Honorable |
| ELLIOTT ROBINSON, | ) ) | Joseph M. Claps, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court's denial of defendant's postconviction petition is affirmed in part, where defendant failed to demonstrate ineffective assistance of appellate counsel after a third-stage evidentiary hearing, and reversed and remanded for third-stage evidentiary hearings on defendant's actual innocence and proportionate penalties clause claims.

¶ 2    Following a jury trial, defendant Elliott Robinson was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) and sentenced to 48 years' imprisonment. Defendant's conviction was upheld on direct appeal. *People v. Robinson*, 2013 IL App (1st) 102476.

¶ 3    Defendant then sought relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2014)). Defendant now appeals the circuit court's second-stage dismissal of his actual innocence and proportionate penalties clause claims, as well as the third-stage denial of his ineffective assistance of appellate counsel claim. For the reasons set forth below, we affirm in part and reverse in part.

¶ 4                                    BACKGROUND

¶ 5    As this appeal represents the second time defendant's case has been before this court, we include only those facts necessary for an understanding of the issues currently before us on appeal.

¶ 6                              *Conviction and Sentence*

¶ 7    Defendant was charged at age 18 and indicted on six counts of first degree murder and four counts of aggravated unlawful use of a weapon for the October 12, 2005, shooting death of Centrale Collins (Collins). Paramedics Neil Sennett (Sennett) and Leroy Phillips (Phillips) testified at trial that they were dispatched to the corner of 71st Street and Champlain Avenue in the afternoon of October 12, 2005, where they found Collins lying on his back with multiple gunshot wounds. Collins was alert and conscious and responded to the paramedics' questions. While in the ambulance, Collins asked Sennett if he would die. Sennett held his hand and responded, "[Y]es, I'm sorry, young man, you are going to die." Phillips then asked Collins whether he knew who shot him. Collins answered, "Elliott." Phillips asked, "Elliott who?" Collins responded, "Elliott from 71st and Champlain." When questioned as to why he was shot, Collins answered, "Over a stolen gun." Collins succumbed to his wounds before reaching the hospital.

¶ 8        Detective Danny Stover (Detective Stover) testified for the State. He was informed of the statements Collins had made to the paramedics and he and his partner, Timothy Murphy (Detective Murphy), commenced a search for an individual named "Elliott" near 71st Street and Champlain Avenue. A public records search yielded the defendant as the only individual with that name who lived in the vicinity of the intersection. Detective Stover and other officers proceeded to the address, in the 7100 block of Champlain Avenue, and spoke with defendant's mother. They then spoke with defendant, who agreed to accompany them to the police station. Defendant's hands were swabbed for gunshot residue, for which the test yielded a negative result.

¶ 9        At the station, the detectives informed defendant of his rights and conducted an interview which was video-recorded. Defendant acknowledged that he knew Collins. He stated that he had met with Collins the previous Monday, at which time Collins informed defendant that "some guys were f***ing with him." Defendant told Collins he would try to acquire bullets from his brother. Defendant acquired the bullets and sold them to Collins for $30. Defendant also told detectives that he was in class at Chicago State University on the day of the shooting, and learned of the incident at approximately 3:45 p.m., while he was still on campus. He then proceeded by bus to the home of Tazie Williams (Williams), arriving at 4:40 p.m. The detectives informed defendant of Collins's statement implicating "Elliott from 71st and Champlain." Defendant continued to deny involvement. While waiting outside the lockup area, defendant told Detective Stover and his colleague that he wanted to talk. Defendant stated "this was bogus," and "I was there, but I didn't shoot him."

¶ 10       Several fired cartridge cases were recovered from the scene of the shooting. No firearm was recovered, but forensic scientists determined through toolmark analysis that the firearm

used to fire the casings was the same one utilized in a June 2, 2005, armed robbery of victim Arne Kent (Kent). On February 10, 2006, Kent provided Detective Stover and another detective with a "tentative identification" in which he selected defendant out of a photo array as the individual who had robbed him at gunpoint. On August 21, 2006, Kent identified defendant out of a lineup at the police station.

¶ 11       Defendant filed a motion *in limine* to prevent the State from introducing evidence related to his alleged involvement in the armed robbery, but the trial court denied the motion. At defendant's trial, Kent testified that, on the day of the robbery, he had picked up his girlfriend, Geneva Benton (Benton), and drove her home. While parked in the alley behind Benton's house, Kent testified that an individual knocked on the window of his vehicle and ordered him to get out. The individual was masked and pointed a firearm at Kent, demanding that Kent remove his clothes and hand over all his money. Kent testified that the individual, standing approximately two feet away from him, then pulled down his mask, and stated, "I'm that N*** Raamon, I don't give a f***. I want everything you got because if you try to run I'm going to kill your a***." Kent then fled and heard gunshots behind him. Kent made an in-court identification of the defendant in the instant appeal as the offender in the robbery.

¶ 12       Benton provided testimony for the defense which contradicted Kent's, testifying that she never witnessed the gunman lift his mask, although she was also unable to view the offender's side-profile at one point during the ordeal. Police also presented to Benton a photo-array and lineup of potential offenders, but she was unable to make an identification. She testified that she did not know the defendant in the instant appeal by name and she made no in-court identification of defendant at his trial.

¶ 13    Williams testified that defendant, whom she considered a friend and knew as "L," arrived at her house on October 12, 2005, at approximately 4:20 to 4:30 p.m. She did not know if defendant had gone to classes that day, but she did not observe him having any school materials with him. Williams testified that defendant had a "nasty"-looking cut on his hand for which she provided him a Band-Aid.

¶ 14    Other witnesses for defendant included a former neighbor, Patrick Steppe (Steppe), and Detective Darrin Crowder (Detective Crowder), who also lived in the neighborhood. Steppe testified to hearing gunshots and immediately thereafter observing three individuals unknown to him running down a gangway on October 12, 2005. In the backyard adjacent to the gangway, Steppe discovered an injured Collins, and dialed 911 to report the shooting. Detective Crowder testified to having known defendant for 10 years and referring to him as "L." On October 12, 2005, Detective Crowder was in his backyard when he heard gunshots and observed four teenagers run down the alley. Detective Crowder recognized one of the teenagers as Evan Odoms (Odoms), and Detective Crowder escorted Odoms to the station to provide a statement later that day.

¶ 15    Odoms also testified for defendant, stating that he had known defendant since he was seven years old and called him "L." Odoms had known Collins for a year and a half and introduced him to defendant. On the day of the shooting, Odoms did not observe defendant in the backyard where Collins was—instead, he observed an individual whom he knew as "Big Mike" holding a handgun. Odoms testified that he turned around and fled at that point, and heard gunshots behind him.

¶ 16    Odoms provided a statement to Detectives Stover and Murphy on the day of the shooting, in which he related his observation of Big Mike holding a firearm. He was unable to

identify Big Mike from a photo array. Approximately one year later, Odoms met with Detectives Stover and Murphy again, as well as Assistant State's Attorney (ASA) Aleksandra Gillespie (Gillespie) to provide a second statement. Odoms was given the opportunity to review his transcribed statement and make any changes to it before signing. Big Mike was not mentioned in this written statement. ASA Gillespie testified that Odoms never conveyed to her in the interview that he had observed a man named Big Mike with a handgun at the scene of the crime.

¶ 17    The jury found defendant guilty of first degree murder and of personal discharge of a firearm that proximately caused Collins's death. Defendant filed a posttrial motion for a new trial, arguing that the scope of other-crimes evidence which the trial court had admitted to prove identity was overly broad and prejudicial. The trial court denied the motion following a hearing.

¶ 18    During the sentencing hearing, the trial court heard testimony from Collins's mother and sister in aggravation and testimony from defendant's mother and sister in mitigation. Defense counsel emphasized defendant's "close knit loving home," his undergraduate-level studies at Chicago State University and Southern Illinois University, and his positive work history. The trial court also considered defendant's presentencing investigation report, in which he reported to a probation officer that he had a normal childhood, devoid of any physical, sexual, or emotional abuse, and was raised by his mother with his twin sister in a "good area." In delivering its ruling, the trial court cited the factors presented in aggravation and mitigation, the defendant's background, and the presentencing investigation report as determinative. The trial court sentenced defendant to 48 years in the Illinois Department of Corrections (IDOC), noting that the minimum sentence for defendant's conviction was 45 years—20 years plus a

25-year enhancement for personal discharge of a firearm—and that no good time credit could be earned. In delivering the sentence, the trial court ruled, "[A]ny sentence less than what I give would in my mind deprecate the seriousness of the offense."

¶ 19    Defendant filed a motion to reconsider the sentence, claiming that his sentence was excessive in violation of the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. At a hearing on the motion, defense counsel declined to present an argument, and the State rested on its prior arguments. Defendant's trial counsel stated, "Well, Judge, *** we have no argument. We're filing a motion to preserve the record. Obviously, you sentenced [defendant] to just three years over the minimum sentence. Obviously, we believe he should be eligible for the very minimum, since he was a college kid with no background." The trial court denied the motion.

¶ 20                                  *Direct Appeal*

¶ 21    On direct appeal, defendant raised several arguments before this court, contesting (1) the admission of Collins's statement as a violation of defendant's rights under the confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI) and *Crawford v. Washington*, 541 U.S. 36, 68 (2004); (2) the trial court's admission of toolmark and firearms identification evidence, especially without conducting a hearing on the methods' scientific acceptance under *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923); (3) the trial court's admission of defendant's statements to detectives that he had sold bullets to Collins and was present at the shooting; and (4) the questioning of the jury venire in *voir dire* as a violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). Defendant had forfeited two of these arguments below by failing to timely object—the admissibility claim regarding defendant's statement that he was present at the shooting and the *voir dire* claim.

We applied a plain error analysis to each of these claims pursuant to Illinois Supreme Court Rule 615(a), but found that the evidence was not so closely balanced such that either error alone threatened to tip the scales of justice against defendant. We affirmed the trial court's conviction in full.

¶ 22                                    *Postconviction Proceedings*

¶ 23            Defendant filed a *pro se* postconviction petition on March 4, 2015, advancing claims of (1) actual innocence, bolstered by two supporting affidavits of newly discovered witnesses—Tatianna Daniels (Daniels) and Ciara Dudley (Dudley)—who both reported observing an individual known as "Big Mike" shoot Collins and attested that defendant was not present at the scene; (2) ineffective assistance of trial counsel for failure to investigate, interview, and subpoena two individuals who could have corroborated defendant's account of events; and (3) ineffective assistance of appellate counsel for failure to raise various other-crimes evidence objections. Defendant was appointed counsel in June 2015; however, he subsequently waived counsel and was self-represented until April 24, 2018. Through his new counsel, defendant filed an amended petition for postconviction relief on January 22, 2021.

¶ 24            Defendant's amended pleading reasserted the actual innocence and ineffective assistance of appellate counsel claims but narrowed the latter claim to concentrate on appellate counsel's failure to prevent the admission of "irrelevant and inflammatory prejudicial" other-crimes evidence related to the armed robbery. The evidence in question was Kent's testimony that "(a) the perpetrator forced [Kent] and Ms. Benton to strip naked and lay on the garage floor, and (b) the perpetrator repeatedly threatened to kill Mr. Kent."

¶ 25            Defendant's amended petition also added a claim that his sentence represented an as-applied violation of the proportionate penalties clause of the eighth and fourteenth amendments

of the United States Constitution and the Illinois Constitution. Specifically, defendant cited *Miller v. Alabama,* 567 U.S. 460, 469 (2012), the United States Supreme Court case that held that mandatory life without parole sentences violate the eighth amendment's prohibition on cruel and unusual punishment when applied to juvenile offenders. Although defendant was already 18 years old and thus not a juvenile at the time of his offense, he cited analogous cases—including *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 63-65 (holding mandatory life without parole sentence for a 19-year-old offender violated the proportionate penalties clause of the Illinois Constitution), which was later reversed by our supreme court in *People v. House*, 2021 IL 125124, ¶ 43—and pointed to evolving scientific understanding of developmental psychology to argue that "he was more akin to a juvenile than an adult" at the time of the crime and therefore "his youth and its attendant characteristics should have been considered during his sentencing."

¶ 26       Defendant appended an evaluation by developmental psychology professor Dr. James Garbarino (Dr. Garbarino), who analyzed the details of the record, interviewed defendant for two hours, and applied the youth sentencing factors from *Miller* to defendant's case. Dr. Garbarino's report reflected his viewpoint that, generally, offenders in their early 20s, especially those with adverse childhood experiences, should not be sentenced in the same manner as older adults. Dr. Garbarino evaluated defendant with a score of 8 out of 10 on the Adverse Childhood Experiences test (10 being the highest adversity), finding that defendant felt rejected by his father and suffered psychological scars from witnessing violence and growing up in an "urban war zone." Additionally, Dr. Garbarino opined that defendant had likely minimized the community violence and dysfunctional family dynamics that he

9

experienced during his upbringing in the presentencing investigation report due to immaturity and an instinct to shield his family's history from law enforcement.

¶ 27    The circuit court advanced defendant's petition to the second stage. The State filed a motion to dismiss on April 7, 2021, arguing that defendant's claim of actual innocence was undercut by his affiants' failure to provide any additional identifying information of "Big Mike," that defendant failed to assert a substantial showing of prejudice and objectively unreasonable action for his ineffective assistance of appellate counsel claim, and that defendant's proportionate penalties clause and eighth amendment claims failed under Illinois case law articulated in *People v. Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41, and *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 52.[1]

¶ 28    On October 21, 2021, the circuit court granted the State's motion to dismiss as to defendant's claims regarding actual innocence, the eighth amendment, and the proportionate penalties clause. The written order stated that, with regard to defendant's actual innocence claim, some of his affiants' statements concerning defendant's absence from the scene of the crime were positively rebutted by the record—namely, his own admission to Detective Stover while waiting outside the lockup area that he was present at the scene of the crime but did not shoot Collins. The circuit court reasoned, therefore, that "[b]ased on this information, it is unlikely that Daniels['s] and Dudley's testimony is of such a conclusive character as to change the results of the case on retrial." As to defendant's eighth amendment claim, the circuit court ruled that the *Miller* line of cases plainly did not apply to defendant since he was not a juvenile

---

[1] *Ruiz*, 2020 IL App (1st) 163145, ¶ 29, which established a three-step procedure for *Miller*-type postconviction claims from young adult offenders commencing with a criminal defendant's pleading and proof that his or her individual characteristics require the application of *Miller*, was subsequently recognized as abrogated in *People v. Hilliard*, 2023 IL 128186, ¶ 28 ("*Miller* applies to neither discretionary sentences nor adults" (citing *People v. Moore*, 2023 IL 126461, ¶ 38)).

at the time of his offense. The circuit court recognized, however, that defendant could be considered a youthful offender as he was still 18 years old at the time. Citing *People v. Evans*, 2021 IL App (1st) 172809, ¶ 19, the circuit court ruled that in order to prevail on his proportionate penalties clause claim, defendant was required to plead enough facts to warrant advancement to third-stage proceedings in which he would prove that his "specific and individual characteristics require[d] the application of *Miller*." The circuit court found that defendant had not satisfied this standard, as the depiction of defendant's development relayed in Dr. Garbarino's report "contradict[ed] the facts set forth in the trial record," particularly as contained in defendant's presentencing investigation report. Lastly, the circuit court denied the State's motion to dismiss defendant's ineffective assistance of appellate counsel claim and advanced the matter to a third-stage hearing on that claim.

¶ 29      The circuit court conducted a third-stage evidentiary hearing on defendant's ineffective assistance of appellate counsel claim on September 22, 2022. No witnesses were called for defendant. The State called Assistant Appellate Defender Melinda Grace Palacio (Palacio), defendant's counsel on his direct appeal, to testify as to her consideration of the other-crimes evidence issues in his case. Palacio testified that she had included in a memo to her supervisor after her review of the case a discussion of the strengths and weaknesses of potential other-crimes evidence claims, including a claim regarding the testimony in the record pertaining to the Kent robbery. After discussing the matter with her supervisor, Palacio determined that the five other claims which she ultimately raised on direct appeal were stronger and more likely to be meritorious for defendant.

¶ 30      In closing, defendant's postconviction counsel argued that "the fact that there were five other meritorious issues that were raised on direct appeal does not diminish the merit of this

11

claim." Defendant's postconviction counsel referenced *People v. Butler*, 31 Ill. App. 3d 78 (1975)—which Palacio had acknowledged in her internal office memo on defendant's appeal before deciding not to advance the other-crimes evidence claim—as an example of a similar other-crimes evidence claim that was meritorious. Specifically, defendant's postconviction counsel stated that "when evidence of other crimes is admissible on the question of identity, it should be confined to such details to show the opportunity for identification and not the details of the crime," rather than irrelevant details which tend to prejudice the jury. Here, defendant's postconviction counsel contended that Kent's testimony regarding the offender's repeated threats and his forcing Kent and Benton to remove their clothes and lie on the floor was outside that scope. Postconviction counsel argued, therefore, that defendant should prevail on his ineffective assistance of appellate counsel claim due to the prejudicial weight of the other-crimes evidence regarding the Kent robbery and his appellate counsel's failure to raise a corresponding claim on the issue on direct appeal.

¶ 31     The State argued that the details shared in Kent's testimony were necessary to equip the jury with an understanding of the circumstances surrounding the armed robbery so as to provide context to the crime which had been linked to the same weapon used to kill Collins. To the extent that appellate counsel should have nonetheless raised the other-crimes evidence claim on direct appeal, the State noted Palacio's consideration of the issue and her acknowledgment of *Butler*, and argued that it was in her professional discretion to instead proceed with the claims she found more likely to be meritorious. The State also asserted that defendant had failed to support his claim that this choice had resulted in prejudice with anything other than a citation to *Butler*, and thus he had not satisfied the standard for ineffective assistance of counsel.

¶ 32    In rebuttal, defendant's counsel emphasized that *Butler* was still good law despite its published date of 1975, and that its holding would have supported the meritoriousness of a potential other-crimes evidence claim had defendant's appellate counsel raised it on direct appeal.

¶ 33    Defendant requested and received leave of court to read a letter in which he maintained his innocence as to the murder of Collins and stated that a suspect had come forward with a confession in the Kent robbery case.

¶ 34    On November 22, 2022, the circuit court denied relief on defendant's ineffective assistance of appellate counsel claim in an oral ruling, holding that defendant had failed to meet his burden based on the evidence and arguments presented.

¶ 35    Defendant then filed this timely appeal.

¶ 36                                    ANALYSIS

¶ 37    On appeal, defendant challenges the circuit court's dismissal of his postconviction claims of ineffective assistance of appellate counsel, actual innocence, and proportionate penalties clause violations. Defendant's ineffective assistance of counsel claim was denied after a third-stage evidentiary hearing pursuant to the Act, and his two remaining claims were dismissed after a second-stage hearing. See 725 ILCS 5/122-5, 122-6 (West 2020).

¶ 38    Under the Act, a defendant in custody may submit a petition alleging a substantial denial of constitutional rights in the proceedings which led to his conviction. *Id.* § 122-1. To avoid *res judicata* issues, this petition must present legal claims which are distinct from those already decided in a direct appeal. *People v. Coleman*, 2023 IL App (1st) 210263, ¶ 21. Frivolous and non-meritorious postconviction petitions shall be summarily dismissed by the circuit court within 90 days of filing. 725 ILCS 5/122-2.1 (West 2020). If the petition survives

summary dismissal, it moves onto the second stage, at which point the court may appoint counsel for an indigent defendant, and defendant may file an amended petition. *Id.* §§ 122-2.1, 122-4. The State must then either answer or move to dismiss the petition. *Id.* § 122-5. In ruling on a second-stage motion to dismiss, the circuit court must take all well-pleaded facts that are not positively rebutted by the trial record as true and then determine whether the petition and its accompanying documentation demonstrate a substantial showing of a constitutional violation. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 90. As the court is not to make any fact-finding or credibility determinations at this stage, the standard is a legal determination rather than a factual one. *Id.* Accordingly, dismissal of a claim for postconviction relief at the second stage is reviewed *de novo*. *Id.* ¶ 91.

¶ 39        Fact-finding and credibility determinations occur at the third stage, wherein the circuit court holds an evidentiary hearing and defendant bears the evidentiary burden of demonstrating a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If no fact-finding and credibility determinations are necessary at this stage, then a reviewing court will apply a *de novo* standard of review; otherwise, a dismissal of a postconviction claim after a third-stage hearing is reviewed for manifest error. *Velasco*, 2018 IL App (1st) 161683, ¶ 137. A court reviewing for manifest error, also known as the manifestly erroneous standard, will only reverse the lower court's ruling if it is against the manifest weight of the evidence. *Id.* An error that is against the manifest weight of the evidence is one that is "clearly evident, plain, and indisputable." *People v. Reyes*, 2025 IL 240172, ¶ 25 (internal quotation marks and citations omitted). For claims of ineffective assistance of counsel, our review often requires us to address a mixture of both legal and factual determinations, and therefore the lower court's factual determinations as to such claims are reviewed for manifest

14

error while the ultimate determination of ineffective assistance of counsel is reviewed *de novo*. *Velasco*, 2018 IL App (1st) 161683, ¶ 137.

¶ 40                    *Defendant's Ineffective Assistance of Appellate Counsel Claim*

¶ 41          Criminal defendants are entitled to effective assistance of counsel, including on direct appeal, as guaranteed by both the United States and Illinois Constitutions. U.S. Const., amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 341-45 (1963) (incorporating the sixth amendment right to counsel against the states through the due process clause of the fourteenth amendment, U.S. Const., amend. XIV, § 1); Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (establishing the right to reasonably effective assistance of counsel); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*); *Evitts v. Lucey*, 469 U.S. 387, 397-400 (1985) (establishing the right to effective assistance of counsel on direct appeals); *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989) (recognizing the claim of ineffective assistance of appellate counsel for a postconviction petition). In order to prevail on ineffective assistance of counsel claims, including those raised in postconviction proceedings, defendants must satisfy the two-pronged test from *Strickland*, 466 U.S. at 687, which requires a showing that (1) defendant's counsel's performance was deficient—meaning it fell below an objective standard of reasonableness according to prevailing professional norms; and (2) counsel's performance prejudiced the defense—meaning but for counsel's deficiency, there was a reasonable probability that the proceeding would have resulted in a different outcome. *Id.* at 694; *People v. Domagala*, 2013 IL 113688, ¶ 36. Under the performance prong, "[a]ppellate counsel is not obligated to brief every conceivable issue on appeal," nor is appellate counsel ineffective for "refrain[ing] from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Simms*, 192 Ill. 2d

15

348, 362 (2000). Additionally, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

¶ 42     Here, defendant contends his appellate counsel was ineffective for failing to raise a claim on direct appeal contesting the trial court's admission of overly prejudicial other-crimes evidence related to the Kent robbery. Although defendant's appellate counsel raised an other-crimes evidence claim on direct appeal regarding defendant's statement to detectives that he had sold bullets to Collins, his appellate counsel did not advance the argument that the trial court had erroneously admitted prejudicial evidence in the form of Kent's testimony that exceeded the permissible scope of testimony to prove identity. Defendant contends that Kent's statements that the offender demanded him to hand over all his money, that he commanded him to remove his clothing and lie down on the floor, and the threatening statements that he made throughout the robbery (including the pronouncement, "I'm that N\*\*\* Raamon. I don't give a f\*\*\*. I want everything you got because if you try to run I'm going to kill your a\*\*\*"), were unduly prejudicial and outside the permissible scope of the evidence that the trial court had circumscribed for the purpose of showing identity.

¶ 43     As defendant's trial counsel failed to object to Kent's testimony at the hearing or raise the claim in a motion to reconsider, thus forfeiting the argument for later proceedings, defendant argues that his appellate counsel should have asserted the claim in his direct appeal through a theory of first-prong plain error. Illinois' plain error doctrine provides that, pursuant to a reviewing court's discretion, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a);

16

*People v. Sebby*, 2017 IL 119445, ¶ 48. Our case law has established two instances in which a reviewing court may consider such unpreserved errors:

> "[W]hen (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 44    Here, defendant requests that we consider his claim under the first prong. As such, defendant must demonstrate that the "quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Id.* at 566. In determining whether the evidence was closely balanced, we must make a qualitative assessment of the totality of the trial evidence. *Sebby*, 2017 IL 119445, ¶ 53. As we articulated in defendant's direct appeal, (*Robinson*, 2013 IL App (1st) 102476, ¶ 97), although the first step of plain error analysis usually entails a determination that an error actually occurred, in claims that rely solely on first-prong plain error doctrine, we need not make that determination before proceeding to our analysis of whether the evidence was closely balanced. *People v. White*, 2011 IL 109689, ¶ 153.

¶ 45    Defendant argues that the trial evidence in his case was closely balanced as but for Kent's identification of defendant as the offender in the robbery and the toolmark evidence linking the weapon used in that crime to the one used in Collins's murder, there would be no physical evidence implicating him in the murder. Defendant further argues, without citation, that our analysis requires us to assess the closeness of the totality of the evidence save for "the

irrelevant, overly prejudicial details of the uncharged offense elicited from Kent" *and* "[defendant]'s alleged admission to being present at the scene." Since the latter plain error argument was already presented and rejected in our prior review, however, we are barred from reconsidering it in the instant appeal. *People v. Davis*, 2014 IL 115595, ¶ 13 ("issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*.").[2]

¶ 46   In defendant's direct appeal, we held that the evidence was not closely balanced when analyzing defendant's claim that testimony regarding his statement to detectives outside the lockup area was improperly admitted. In our discussion there, we cited the evidence of Collins's dying declaration which identified the shooter as "Elliott" from "71st and Champlain," the voting records that tended to reveal that the only other "Elliotts" in the vicinity were unlikely to be involved in the shooting, defendant's admission to police that he was acquainted with Collins, Kent's identification of defendant as the offender in his robbery, and the toolmarks evidence testimony which connected the cartridge cases from that robbery to the same weapon used in the shooting of Collins. As evidence weighing in defendant's favor, we cited the testimony from Steppe, who did not recognize any of the individuals he observed fleeing the scene of the shooting; Detective Crowder, who knew defendant well but only recognized Odoms as one of the individuals fleeing the scene of the shooting; Odoms's

---

[2] Citing *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 15, defendant contends the State forfeited the *res judicata* argument. *Doehring* addresses the State's forfeiture of *res judicata* as evidenced by its failure to raise it in a motion to dismiss the defendant's petition for relief from judgment. *Id.* Petitions submitted under the Act, however, arise in a different context, under a scheme in which our "legislature intended that the court be allowed to make legal determinations based on both *res judicata* and forfeiture," *People v. Blair*, 215 Ill. 2d 427, 446 (2005), and in which "issues that defendants raised on direct appeal are considered, in postconviction proceedings, to be barred." *People v. Haines*, 2021 IL App (4th) 190612, ¶ 18. In this context, the State's failure to raise a *res judicata* argument does not prevent our application of the doctrine.

statements referring to the presence of an individual named "Big Mike" (despite his omission of this detail in his statement to ASA Gillespie, his failure to identify "Big Mike," and his testimony that he had not witnessed the shooting itself); and Williams's testimony to defendant's presence at her home on the date of the shooting (despite testifying to defendant's presence only at approximately 4 to 4:20 p.m., which was after paramedics had already been dispatched to the scene of the shooting). Reevaluating this evidence alongside defendant's admission to being present at the shooting, and removing any evidence relating to the Kent robbery beyond that which went to the identity of the offender, we maintain our previous holding that the evidence in defendant's case was not closely balanced for purposes of first-prong plain error analysis.

¶ 47    Acknowledging our previous ruling, defendant argues that our prior analysis is not binding in the instant appeal as the underlying error involves a source of evidence that defendant posits was more prejudicial than the subject of his previous plain error claim, especially since defendant was thereafter found not guilty of the charges in the armed robbery case involving Kent.[3] Although other-crimes evidence "carries a high risk of prejudice" (*People v. Lindgren*, 79 Ill. 2d 129, 140 (1980)), here the jury was expressly instructed that evidence regarding defendant's involvement in the robbery could be considered only for the limited purpose of identification. As such, we do not agree with defendant that our weighing of the evidence for plain error analysis would be distinct in this appeal.

_____

[3] We take judicial notice of these findings from Cook County circuit court case No. 06 CR 20522. See Ill. R. Evid. 201(b)-(c) (eff. Jan. 1, 2011) (courts may take judicial notice, whether requested or not, of facts which are "not subject to reasonable dispute in that [the facts are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *e.g., People v. Fields*, 2020 IL App (1st) 151735, ¶ 58 (taking judicial notice of the defendant's acquittal in an unrelated shooting in which the same firearm had been used, and for which the State had presented other-crimes evidence in the form of victim testimony identifying the defendant as the offender in that shooting).

¶ 48 Furthermore, defendant contends that the case law on plain error analysis has changed in his favor since our prior ruling. He points to our supreme court's ruling in *Sebby*, 2017 IL 119445, ¶¶ 61-63, which held that where there is a "credibility contest" between versions of events, the evidence is closely balanced for purposes of first-prong plain error analysis. We disagree that the holding in *Sebby* changes our analysis. Unlike in *Sebby*, where the witness testimony on both sides presented credible versions of events (*id.* ¶ 54), here defendant characterizes the jury's deliberation as weighing "Collins'[s] statement to the paramedics and the credibility of Kent's identification of [defendant], on one side, against the credibility of Odoms, a defense witness who saw someone other than [defendant] point a gun at Collins." As Odoms admitted that he did not witness the shooting and he failed to tell ASA Gillespie in his statement that he had observed Big Mike with a firearm, the jury could have reasonably found Odoms's version of events incredible, especially as it was uncorroborated by other witnesses. Thus, since the evidence in defendant's case did not present a relatively even credibility contest like that in *Sebby*, and the evidence is otherwise not closely balanced, we reject defendant's claim that his first-prong plain error argument would have had a reasonable probability of success had his appellate counsel raised it in his direct appeal.

¶ 49 Having fallen short of demonstrating a reasonable probability of success, defendant's claim of ineffective assistance of appellate counsel for failure to raise an inadmissible other-crimes evidence argument through first-prong plain error analysis fails to meet the requirements of *Strickland*'s prejudice prong. See *Strickland*, 466 U.S. at 694. Although we need not separately determine whether counsel's performance was deficient for purposes of *Strickland*'s first prong, we note that appellate counsel testified to discussing the issue with her supervisor, and it was included in an internal office memo revealing her consideration of

various claims for appeal. As appellate counsel is not ineffective for "refrain[ing] from raising issues which, in his or her judgment, are without merit" (*Simms*, 192 Ill. 2d at 362), we find no evidence that defendant's counsel was deficient according to an objective standard of reasonableness. Defendant's arguments fail both prongs of the *Strickland* test, and therefore the circuit court did not err in denying his ineffective assistance of counsel claim.

¶ 50                                *Defendant's Actual Innocence Claim*

¶ 51        Defendant also challenges on appeal the circuit court's second-stage dismissal of his actual innocence claim. For review of a second-stage postconviction claim dismissal, where the standard of proof was a substantial showing of a constitutional violation, we review the circuit court's decision *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 387-89 (1998). Any credibility determinations must be reserved for the third-stage evidentiary hearing, and any well-pleaded facts that are not positively rebutted by the original trial record are taken as true. *Id.* at 385.

¶ 52        A demonstration of actual innocence for a postconviction claim requires the production of evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character as to likely change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Such conclusiveness is supported by a finding that it is more likely than not that no reasonable juror would find the defendant guilty beyond a reasonable doubt when considering the newly discovered evidence alongside the totality of trial evidence. *People v. Sanders*, 2016 IL 118123, ¶ 47; *Velasco*, 2018 IL App (1st) 161683, ¶ 91. The newly discovered evidence does not need to be completely dispositive to be of a conclusive character—rather, "the question is whether the evidence supporting the postconviction petition

places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 48.

¶ 53    Here, the circuit court accepted that the Daniels and Dudley affidavits accompanying defendant's postconviction petition were newly discovered, material, and noncumulative, and the State does not dispute those findings on appeal. The circuit court ultimately dismissed defendant's actual innocence claim based on his failure to demonstrate that the evidence was of conclusive character, adjudging that defendant's affiants' statements were positively rebutted by the record, by both defendant's own statement to detectives that he was present at the shooting, and Collins's dying declaration naming Elliott from 71st and Champlain as his shooter. On appeal, defendant argues that these disparities in the record reflect mere contradictions rather than positive rebuttals or objective refutation of the trial evidence, and that such contradictions are insufficient to warrant dismissal at the second stage of postconviction proceedings. Instead, defendant argues, his actual innocence claim should proceed to a third-stage evidentiary hearing wherein his witnesses may testify and proper credibility determinations may be made. We agree that defendant's actual innocence claim must proceed to a third-stage evidentiary hearing for the circuit court to properly assess the credibility of defendant's witnesses.

¶ 54    Defendant cites *Wilson*, 2022 IL App (1st) 192048, ¶¶ 72, 82, in which our court reversed the circuit court's dismissal of the defendant's actual innocence claim and remanded for a third-stage evidentiary hearing based on a newly discovered eyewitness affidavit which stated that an individual other than the defendant had shot the victim. In *Wilson*, our court applied the supreme court's instructions from *Robinson*, 2020 IL 123849, ¶ 60, that in order for evidence to be positively rebutted by the record, it must " 'be clear from the trial record

22

that *no* fact finder could ever accept the truth of that evidence,' such as where the new evidence 'is affirmatively and incontestably demonstrated to be false or impossible.' (Emphasis added.)." *Wilson*, 2022 IL App (1st) 192048, ¶ 80. Although a juror could plausibly and even probably reject the veracity of the defendant's newly produced evidence in *Wilson*, a reasonable juror could also plausibly reject the veracity of the contradicting evidence in the trial record if, after interrogating the new evidence, it emerged as the more convincing of the two. *Id.* ¶ 81. Accordingly, to allow that evidence to be "appropriately tested and assessed," the matter was remanded to a third-stage evidentiary hearing. *Id.* ¶ 82.

¶ 55     Here, defendant's new witnesses both stated that, from the respective porches at which they were each situated at the time, they observed a man known to them as "Big Mike" shoot Collins, and both attested that defendant was not present at the scene. These statements undoubtedly contradict defendant's own statement made to Detective Stover outside the lockup area after his arrest, in which he admitted he was present at the shooting, as well as Collins's statement to paramedics that Elliott from 71st and Champlain shot him. As in *Wilson*, however, we must distinguish these apparent contradictions between statements from a more conclusive instance of facts being positively rebutted by the record. See *id.* ¶ 80; *Robinson*, 2020 IL 123849, ¶ 60 ("recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted"); see also *People v. Green*, 2025 IL App (1st) 232068-U, ¶¶ 33-34; *People v. Simms*, 2024 IL App (1st) 232096-U, ¶¶ 23-34. Per *Wilson*, evidence that is positively rebutted would present a clear inconsistency in the trial record that no fact finder could accept as true, "such as where the new evidence 'is affirmatively and incontestably demonstrated to be false or impossible.' " *Wilson*, 2022 IL App (1st) 192048, ¶ 80 (quoting *Robinson*, 2020 IL 123849, ¶ 60). Despite Collins's dying

declaration and defendant's own implicatory statement to Detective Stover, there is nothing in the trial record to suggest that *no* potential juror or factfinder could ever reasonably accept the truth of Daniels's or Dudley's statements. See *Robinson*, 2020 IL 123849, ¶ 60. A potential juror could be plausibly convinced, for instance, by the alignment of Daniels's and Dudley's accounts with Odoms's trial testimony and his statement to Detectives Stover and Murphy on the day of the shooting implicating "Big Mike" in place of defendant. Moreover, if a jury were to accept Daniels's and Dudley's statements as sufficiently credible, those eyewitness accounts could conceivably shift the overall weight of the evidence in defendant's favor, thereby placing the trial evidence in a different light and undermining the court's confidence in the judgment of guilt. See *id.* ¶ 48.

¶ 56        Since the new evidence defendant has produced, if believed, could feasibly lead to acquittal on retrial, the circuit court erred in its ruling that that "it is unlikely that Daniels['s] and Dudley's testimony is of such a conclusive character as to change the results of the case." Defendant has therefore satisfied the burden of a substantial showing of a constitutional violation, and the matter must proceed to a third-stage evidentiary hearing where proper credibility determinations may be made as to his actual innocence claim.

¶ 57        *Defendant's Proportionate Penalties Clause Claim*

¶ 58        Defendant's third claim on appeal is that the circuit court erred in denying his proportionate penalties clause claim. Under the Illinois Constitution, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. A sentence violates this clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the

community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). Subsequent to the United States Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. at 469, which held that the eighth amendment prohibits the sentencing of juvenile offenders to mandatory life without parole, our courts have expanded similar protections to defendants who receive *de facto* life sentences of more than 40 years (*People v. Buffer*, 2019 IL 122327, ¶ 40), and have recently raised the possibility that young or "emerging" adult offenders may bring as-applied proportionate penalties clause claims relying on the same developmental science that undergirds *Miller* (*People v. Clark*, 2023 IL 127273, ¶ 87). As noted above, at second-stage proceedings, credibility determinations must be reserved and well-pleaded facts that are not positively rebutted by the original trial record are taken as true. *Coleman*, 183 Ill. 2d at 385. Our review of proportionate penalties clause claims after second-stage postconviction proceedings is *de novo*. *Coleman*, 183 Ill. 2d at 387-89.

¶ 59    As a preliminary matter, the State contends that defendant forfeited his proportionate penalties clause claim as he failed to raise it at the time of his sentencing or on direct appeal. Defendant argues that his proportionate penalties clause claim was not forfeited as "[defendant] could not have raised it on direct appeal without the evidence he attached to his initial post-conviction petition." Here, defendant references Dr. Garbarino's report, *Miller* and its progeny, and the broader advancements in the field of developmental psychology since the time that defendant filed his direct appeal.

¶ 60    We acknowledge that *Miller*, published on June 25, 2012, was decided during the pendency of defendant's direct appeal, but our supreme court did not authorize the application of its principles to defendants who were 18 or older at the time of their offense in postconviction proceedings until 2015, in *People v. Thompson*, 2015 IL 118151, ¶¶ 38, 44. In

that case, which was brought as a petition for relief from judgment under section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)), the Illinois supreme court affirmed our court's ruling that the defendant could not raise an as-applied *Miller*-based constitutional challenge to his mandatory natural life sentence for the first time on appeal, but clarified that he was "not necessarily foreclosed from renewing his as-applied challenge in the circuit court." *Thompson*, 2015 IL 118151, ¶ 44. "To the contrary," the court reasoned, "the Post-Conviction Hearing Act is expressly designed to resolve [such] constitutional issues." *Id.* (internal citations omitted).

¶ 61        Since the ruling in *Thompson*, our courts have rearticulated this principle in various postconviction cases which raised as-applied *Miller*-type proportionate penalties clause claims. See, *e.g.*, *People v. Harris*, 2018 IL 121932, ¶¶ 44, 48 (reaffirming on direct appeal, in an opinion reversing the appellate court's finding that defendant's sentence violated the proportionate penalties clause, the principle from *Thompson* that defendant's claim would be more appropriately addressed through a postconviction petition so as to properly develop the record regarding whether *Miller* applies to the defendant's particular circumstances); *House*, 2021 IL 125124, ¶ 32 (remanding to the circuit court for second-stage postconviction proceedings to develop the record regarding defendant's *Miller*-type proportionate penalties clause claim); *People v. Herring*, 2022 IL App (1st) 210355, ¶¶ 27, 36-39 (remanding for second-stage postconviction proceedings and rejecting the State's argument that defendant forfeited his proportionate penalties clause claim by failing to raise it at sentencing); *People v. Spencer*, 2025 IL 130015, ¶¶ 41-48 (affirming defendant's sentence on direct appeal but holding that defendant was not foreclosed from bringing his as-applied proportionate penalties

clause claim in a postconviction proceeding, which would be the "proper venue" in which to sufficiently develop the evidentiary record).

¶ 62        We note that another division of our appellate court recently has suggested that courts have "overread" the decision in Harris, and should have instead found the defendants' respective proportionate penalties clause claims forfeited where the claims were not raised in the trial court at sentencing. *People v. Hewitt*, 2025 IL App (1st) 231294, ¶ 69, *pet. for leave to appeal allowed*, No. 132458 (filed Jan. 28, 2026). Our supreme court recently allowed a petition for leave to appeal in *Hewitt*.

¶ 63        In keeping with the *Thompson* line of cases, however, and accepting that defendant likely would not have been able to benefit from Dr. Garbarino's report and the emerging developmental science upon which it relied, in addition to our developing case law on young adult offenders, until after the time of his sentencing and direct appeal, we refrain from a finding that defendant has forfeited his proportionate penalties clause claim at this time.

¶ 64        We also reject the State's argument that defendant's case may be analogized to successive postconviction petition cases involving discretionary life sentences which were dismissed due to those defendants' failure to show cause for not raising proportionate penalties clause claims in their initial petitions. The fundamental principle undergirding the Act, allowing incarcerated defendants to raise constitutional challenges to the proceedings which led to their convictions through claims that " 'have not and could not have been previously adjudicated,' " naturally makes it so successive postconviction petitions are disfavored. *People v. Dorsey*, 2021 IL 123010, ¶ 31 (quoting *People v. Holman*, 2017 IL 120655, ¶ 25, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42). Accordingly, our supreme court articulated in one such case that the State cites here, *People v. Davis*, 2014 IL 115595, ¶ 14,

that "a defendant faces immense procedural default hurdles when bringing a successive postconviction petition. Because successive petitions impede the finality of criminal litigation, these hurdles are lowered only in very limited circumstances." See also *Haines*, 2021 IL App (4th) 190612, ¶ 59 (affirming denial of leave to file successive postconviction petition "because of defendant's failure to clear the high hurdle of cause in section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)," which sets standards for leave of court to be granted for successive postconviction petitions); *Clark*, 2023 IL 127273, ¶ 39 (affirming denial of leave to file successive postconviction petition while noting "that the filing of successive postconviction petitions is 'highly disfavored' because it 'plagues' finality") (internal quotation marks and citations omitted). As defendant's instant appeal involves an initial postconviction petition rather than a successive one, we find these cases uninstructive on the matter of forfeiture.

¶ 65    Proceeding to the merits, we note that the circuit court based its denial of defendant's proportionate penalties clause claim on a finding that "the well-pled facts in petitioner's post-conviction petition contradict the facts set forth in the trial record," and that therefore defendant had failed to demonstrate a substantial showing that his "specific and individual characteristics require[d] the application of *Miller*." As such, and since this claim was also dismissed after the second stage, our analysis echoes the treatment of the "positively rebutted by the trial record" standard as discussed above regarding defendant's actual innocence claim.

¶ 66    In his presentencing investigation report, defendant represented his childhood as "normal," relating that he grew up in a "good area" and free from abuse. Defendant further reported working two different jobs and attending college. By contrast, Dr. Garbarino's report

stated that defendant's neighborhood was an "urban war zone," in which defendant's "experience of psychological maltreatment was severe and pervasive." Dr. Garbarino also claimed that defendant was "under the influence of gang members," to whom he was drawn "as a compensation for his lack of affirming relationships at home." These contentions indeed seem to contradict defendant's own statements made in his presentencing investigation report, that he had close relationships with his mother and twin sister and was uninvolved in gang activity.

¶ 67    As in defendant's actual innocence claim, though, our recognition of these contradictions in the record does not amount to our supreme court's standard that "[f]or new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. Although a jury may not find Dr. Garbarino's assessment sufficiently individualized enough to be convincing as to the claim that defendant was more like a juvenile at the time of his offense, it is also not unfeasible to imagine a fact finder who could be so convinced by the same evidence. Defendant was 18—barely an adult—at the time of his offense, and as Dr. Garbarino suggested, his answers in the presentencing investigation report and subsequent representations of himself throughout sentencing could have been motivated by a desire to protect his family from law enforcement, as well as by a desire to highlight his rehabilitative potential so as to reduce the length of his sentence. Since it is not apparent that no fact finder could ever accept the truth of the new evidence, *Robinson* dictates that the contradictions present in the record be further interrogated in the context of a third-stage evidentiary hearing, wherein Dr. Garbarino may

clarify how defendant's individual characteristics made him more like a juvenile at the time of his sentencing, and the circuit court may assess the strength of those arguments. See *id.* ¶ 61.

¶ 68                                                     CONCLUSION

¶ 69          For the reasons set forth above, we affirm the judgment of the circuit court denying defendant's ineffective assistance of appellate counsel claim after third-stage proceedings, and reverse the circuit court's second-stage dismissal of defendant's actual innocence and proportionate penalties clause claims. The matter is remanded to the circuit court for third-stage evidentiary hearings on defendant's actual innocence and proportionate penalties clause claims.

¶ 70          Affirmed in part and reversed in part.